**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CARLEEN M. MCKNIGHT, | ) | |
| SSN: 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 | ) | |
| | ) | Case No. 20-cv-5971 |
| Plaintiff, | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| v. | ) | |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This case arises from the Social Security Administration's denial of Plaintiff Carleen McKnight's application for disability insurance and supplemental security income for the period from April 20, 2017, to June 5, 2019. Plaintiff seeks review of the agency's decision denying her benefits.

Plaintiff has moved [23] for summary judgment, asking this Court to reverse the decision of the Administrative Law Judge ("ALJ") denying her benefits and remand the case to the Social Security Administration ("SSA") with instructions to grant Plaintiff's application, or, in the alternative, for further proceedings. Because the Court agrees with Plaintiff that the ALJ's incomplete credibility determination precludes adequate appellate review and permeates her assessment of Plaintiff's physical and mental residual capacity, the Court reverses the agency's determination and remands for further proceedings consistent with this opinion.

## I.  Background

### A.  Procedural History

In May 2017, Plaintiff Carleen McKnight ("Plaintiff") applied for disability insurance benefits, as well as supplemental security income.  [23 (Pl. Br.) at 2] (citing [20-1 (Admin. R. ("AR")) at 17.])[1]  In both applications, Plaintiff alleged a disability beginning April 20, 2017, due to degenerative disc disease, hypothyroidism, left knee problems, hip problems, and depression. [AR at 17.]  The claims were denied initially and upon reconsideration.  [*Id.*]

An administrative law judge (ALJ) held a hearing on March 21, 2019, which featured the testimony of Plaintiff, an impartial vocational expert named Linda M. Gels, and an impartial medical expert named James M. McKenna, M.D., who testified by phone.  Ultimately, in a decision dated June 5, 2019, the ALJ denied Plaintiff's claims.  [AR at 17.]  While the Court will elaborate on the ALJ's decision in Section III below, it will suffice for now to note that the ALJ concluded that although Plaintiff has severe impairments, she could perform a range of light work and was able to perform significant number of jobs in the economy such that she did not qualify as disabled under the five-part framework for assessing Plaintiff's claims.

Plaintiff subsequently requested review by the Appeals Council, and the Appeals Council denied this request, leaving the decision of the ALJ as the final decision of the Commissioner. [AR at 5.]

Having exhausted her administrative remedies, Plaintiff filed this suit against the Commissioner of the Social Security Administration, seeking review of the agency's determination.  In short order, Plaintiff moved [23] to reverse the decision of the Commissioner,

---

[1] All references to the Administrative Record—available on this Court's docket, see dkt. Nos. 20-1 and 20-2—will be referred to as "AR" throughout this opinion.  The pin cite refers to the pagination assigned on the Administrative Record, located at the bottom right-hand corner of the document.

arguing that the ALJ erred in evaluating her residual functional capacity, the medical source opinions, and her subjective symptoms. See [23 (Pl.'s Br. in Support of Reversing the Decision of the Commissioner of Social Security ("Pl. Br.")); 31 (Pl.'s Reply to the Def.'s Resp. to Pl.'s Mot. for Summ. J. ("Pl. Reply")).][2] Plaintiff did not specify under what rule she chose to move for reversal; however, Defendant did not object to resolving the case at this juncture. Defendant thus filed an opposition brief stylized as a "response to plaintiff's motion for summary judgment," in which Defendant contends that the ALJ's decision was supported by substantial evidence and warrants affirmance. See [30 (Def.'s Resp. to Pl.'s Mot. for Summ. J. ("Def. Opp. Br.")).]

Plaintiff's motion [23] is now before this Court, which has jurisdiction under 42 U.S.C. §§ 405(g), 1383(c)(3).

### B. Factual Background and Relevant Medical Treatment

Plaintiff was born on November 11, 1970. At the time of the alleged onset of disability, she was 46 years old, and at the time of the ALJ hearing she was 48 years old. [AR at 24.] She is five feet four inches tall and weighed approximately 228 pounds at the time of the ALJ's determination. [*Id.*] She has an LPN license and at the time of the ALJ hearing was not working. [*Id.* at 49.] Her work history includes part-time positions at various employers from 2009 forward. [*Id.* at 50–52.] At the time of the hearing, her most recent position was at the Round Lake School District, where she worked as a school nurse. [*Id.*] She stopped working on May 14, 2017, [*id.* at 49,] because of severe pain, see [*id.* at 52] (testifying that among other things, her "body was aching all the time," and she had difficulty getting out of bed.)

---

[2] Although this appears to be an unusual vehicle for disposing of this case, both parties have treated the issues as proper for decision on summary judgment. Given that none of the parties' arguments turn on disputed issues of fact but rather whether the ALJ's opinion was properly supported and adequately explained, the Court will hold both parties to their choices and apply the summary judgment standards.

Plaintiff's request for this Court's review of the agency's decision turns on several aspects of her application, including her claims that the ALJ's findings with respect to her physical and mental health issues for which she sought care between 2017 and 2019 were contrary to the evidence. Several impairments appear to have spiked in or around that time, at which point she left her position as a school nurse. She alleges that she is limited by the pain she suffers in her hips, knees, back, and hands, as well as depression and anxiety which she alleges arise from her physical pain.

### C.    Hearing Before the ALJ

An administrative law judge (ALJ) held a hearing on March 21, 2019. That hearing featured testimony by Plaintiff, James M. McKenna, M.D., an impartial medical expert, and an impartial vocational expert named Linda M. Gels. During the 2019 hearing, the ALJ asked Plaintiff a series of questions about her work history, her conditions, as well as her daily activities. The Court will elaborate further on Plaintiff's testimony as context for its analysis in Section III, below.

Dr. McKenna, the medical expert, testified at the ALJ hearing by phone. He discussed several issues relevant to petition now before this Court. He summarized the assessments of various providers, whose records are discussed in further detail in Section V, below, including an orthopedist, neurologist, and rheumatologist, together with observations from the X-rays and MRI imaging.[3] He noted generally that Plaintiff's X-rays and MRI appeared within normal limits, and

---

[3] Regarding Plaintiff's hip issue, Dr. McKenna described the X-rays referred to above as showing that her pelvis and left hip "were entirely within normal limits," [AR at 65], explained that the orthopedist's examination showed "somewhat inconsistent musculoskeletal pain, but they do not reliably refer to the hip joint," and that a review of the X-rays "showed some impingement anatomy" and recommended concentrating on her spine. [*Id.*]

As to her spine, McKenna noted the back pain but also explained that the MRI showed "an age-appropriate finding" and further indicated that the degenerative disc disease was not "causing problems,"

he further observed that the various specialists indicated she "appears healthy, alert, in no distress" such that even in these examinations there was some "dichotomy and incongruity between some of the complaints and some of the appearance in the examination." [AR at 68–69] (testifying similarly about the assessments of her neurologist, who likewise noted she was "awake, alert, and in no acute distress" and found the symptoms consistent with "mechanical back pain, musculoskeletal spasm, not radiculopathy.")

With respect to the listed impairments, McKenna stated that Plaintiff did not qualify for Listing 1.02A with respect to her left knee and hip: the left knee was "pretty benign" given the X-ray results, the consultative exam within normal limits, and with no definitive MRI. Regarding her spine, he opined that there was no radiculopathy, but that "just going to go with the mechanical back and facet arthritis" without "nerve root impingement" the examinations did not satisfy 1.02A or 1.04A. [*Id.*]

## II.    Disability Standard

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and related regulations. The Act defines "disability" as "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To be found disabled, the claimant's impairment must be of such severity that it not only prevents her from doing her previous work, but also prevents her from engaging in any

---

and the slightly protruding discs were "not causing any critical compression or impingement on anything." [AR at 65.] He conceded that there were some issues with the quality of the imaging. [*Id.* at 65.] He noted facet arthritis, but he could not indicate the severity of the arthritis or if it was age appropriate given the MRI quality. [*Id.*] He also noted the rheumatologists view that Plaintiff might have a mechanical back issue.

other kind of substantial gainful work which exists in significant numbers in the national economy, considering age, education, and work experience. *Id*. § 423(d)(2)(A).

Social Security regulations set out a five-step inquiry to evaluate whether a claimant is entitled to disability insurance benefits. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also *Stage v. Colvin*, 812 F.3d 1121, 1124 (7th Cir. 2016). The five-step inquiry requires the ALJ to evaluate, in sequence:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner], see 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000), *as amended* (Dec. 13, 2000). An affirmative answer leads to the next step, or for Steps 3 and 5, to a finding that the claimant is disabled. *Id.* A negative answer ends the inquiry and leads to a determination that a claimant is not disabled, except at Step 3. *Id.* At Steps 4 and 5, the ALJ must consider the claimant's residual functional capacity ("RFC"). "The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). The ALJ must assess the RFC based on all the relevant record evidence. *Id.* at 1001 (citing 20 C.F.R. § 404.1545(a)(1)). The burden of proof is on the claimant for Step 1 through Step 4. *Clifford,* 227 F.3d at 868. The burden shifts to the Commissioner at Step 5. *Id.*

## III.  The ALJ's Opinion

The ALJ concluded that Plaintiff was not disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act from May 16, 2017, through the date of the issuance of her opinion, dated June 5, 2019. [AR at 17.] The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2022. [*Id.* at 20.] She also found

6

that the Plaintiff had not engaged in substantial activity since April 20, 2017, the alleged onset date. [*Id.*]

Regarding step two, the ALJ found that Plaintiff had the following severe impairments: depression, anxiety, degenerative disc disease of the spine, fibromyalgia, and obesity. [AR at 20.] However, the ALJ determined that all other impairments alleged and in the record "are non-severe or not medically determinable," including hypothyroidism, pre-diabetes, sleep apnea, and left hip pain, because "there were no significant objective medical findings in the record to support more than minimal limitations on the claimant's ability to perform work activities arising from these impairments." [*Id.*] Acknowledging that Plaintiff had premised her claim for disability in part on hip pain and left knee problems, the ALJ nevertheless reasoned that the record establishes those conditions are "not severe:"

> Treatment records document reports of left hip pain that is "intermittently symptomatic." Imaging of the pelvis and left hip have demonstrated a well-preserved joint space and x-ray examination of the left knee was normal. In July 2017, the claimant was seen by an orthopedist for hip pain who assessed that the claimant had "some diffuse and somewhat inconsistent musculoskeletal pains around her hip but they do not reliably refer to the hip joint" (19F/3). In addition, the claimant has often demonstrated normal gait and full range of motion of the knee on examination (11F/15; 12F/4; 14F/1; 16F21). Since her symptoms did not significantly limit the claimant's mental or physical ability to perform work related activities, the undersigned finds that the aforementioned impairments are "non-severe."

[*Id.* at 21.]

At Step 3, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. [AR at 21.] As to her mental health, the ALJ had to consider whether her impairments alone or in combination met the criteria for Listing 12.04 and 12.06. She found that Plaintiff's claimed impairments did not constitute at least two "marked"

limitations or one "extreme" limitation so as to qualify for "paragraph B" of criteria to meet the level of severity. [*Id.* at 23.]

Before proceeding to Step 4, the ALJ evaluated Plaintiff's residual functional capacity and found that Plaintiff could perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: climb ladders, ropes or scaffolds; occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; never be around unprotected heights, dangerous heavy moving machinery and heavy vibration; frequently push and pull, reach in all directions and handle with the bilateral upper extremities; understand, remember and carryout [*sic*] simple routine tasks and use judgment limited to simple work related decisions; and frequent interaction with supervisors, coworkers and the general public. [AR at 24.]

Several aspects of the ALJ's discussion of the residual functional capacity finding are relevant to the motion now before this Court. The ALJ explained that the finding is made pursuant to a two-step process: (1) determine "an underlying medically determinable physical or mental impairment * * * that could be reasonably expected to produce the claimant's pain or other symptoms," and (2) evaluate "the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations." [AR at 24.] According to the ALJ, although Plaintiff's claimed medical impairments *could* be expected to cause the alleged symptoms, Plaintiff's support faltered at the second step, which entails an evaluation of the extent to which the symptoms limited her functional limitations. [*Id.* at 26.]

### 1. Physical Impairments

In reaching her conclusion regarding the severity of Plaintiff's physical symptoms, the ALJ drew on Plaintiff's May and October 2017 Adult Disability Reports, Plaintiff's own testimony, described above, the objective medical evidence, and other evidence in the record to determine if

Plaintiff's symptoms limit her ability to do work-related activities. See [AR at 24.][4] As to the degenerative disc disease of the lumbar spine, she noted that Plaintiff had undergone intermittent epidural steroid injections and caudal injection, which she reported to her provider had "75 percent relief regarding her low back and left leg pain;" had been prescribed Lyrica for fibromyalgia; and her treating providers recommended only "conservative treatment measures." [Id. at 26.]

The ALJ also reviewed medical records from Plaintiff's appointments with multiple providers throughout the 2017 and 2018 period. A June 2017 assessment revealed "light touch in the lower extremities and straight leg raise testing was negative bilaterally;"[5] Plaintiff's rheumatology records from January 2018 through September 2018 demonstrated "no synovial thickening;" Plaintiff presented as in no "acute distress, appeared healthy and pleasant, and was alert with 5/5 strength" during various exams;[6] and Plaintiff's records for low back pain concluded

---

[4] Regarding the Adult Disability Reports, as to Plaintiff's physical abilities, the ALJ noted that Plaintiff alleged that her medical conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel and climb stairs; and her physical limitations include being limited to ten minutes of walking and could resume after resting for five minutes. [Id. at 25.] Plaintiff further reported she does not prepare her own meals and does not perform any household chores. [Id.] The ALJ also observed that Plaintiff indicated she could follow written and spoken instructions, needs reminders to take her medication, spends time with others by talking to her friend and daughter on the phone and attending church if she feels up to it on Sundays, did not have problems getting along with family, friends, neighbors and others; could pay attention for thirty minutes, and does not complete tasks she begins. Plaintiff reported her conditions also affected her ability to remember, complete tasks, concentrate and use her hands. [Id.]

[5] The ALJ drew on records from Plaintiff's appointment with Votta-Velis, MD. See [AR at 26] (citing AR 15F/12-13.) Dr. Votta-Velis described Plaintiff as having "anantalgic" gait and "limited range of motion in the lumbar spine and left hip. [Id. at 574–75.] However, the provider also stated that Plaintiff's "sensation was intact" and "straight leg raise was negative bilaterally." [Id. at 575.] Those notes also indicate that she is "able to ambulate without assistance," [id. at 574,] and ordered an MRI, [id. at 575.]

[6] In 2018, Plaintiff saw a rheumatologist, Bob H. Sun, M.D in 2018, with mixed results as well. Dr. Sun observed Plaintiff had 16/18 tender points during a number of visits between January. [AR at 668, 879.] (+ tender points along 16/18 tender points). Dr. Sun diagnosed her with fibromyalgia. See [id. at 880.] ("differential diagnosis includes * * * fibromyalgia.") At the same time, Dr. Sun's observations also revealed that Plaintiff "did not appear to be in acute distress," appeared "healthy" and "pleasant," and was "alert" with "5/5 (normal) strength." [Id. at 668.] The records reveal that she had "no synovitis" on multiple occasions from January through September. See [id.] (January 2018 visit); [id. at 912] (April 2018 visit); [id. at 927] (September 2018 visit.)

that her "pain was most consistent with mechanical back pain and not radiculopathy" and recommended only "conservative treatment," noting she displayed "5/5 strength, intact sensation, and normal gait" on examination.[7] [*Id.*]

The ALJ also considered and addressed objective diagnostic studies, including an MRI of the lumbar spine showing "no mass effect on thecal sac or exiting nerve roots";[8] and imaging of the pelvis and left hip "demonstrated a well-preserved joint space" and "x-ray examination of the left knee was normal." [AR at 27.][9] A 2018 EMG further revealed "only subtle evidence for lumbar radiculopathy." [*Id.*]

As to the use of a cane, the ALJ acknowledged that Plaintiff was prescribed a four-point cane but reasoned that she "had essentially normal physical examinations" and that the impartial medical expert testified that "a cane is not medically required for the claimant based on her ability

---

[7] Plaintiff met with Paul E. Laster, M.D., in July 2018. He stated that McKnight had "5/5 (normal) strength, intact sensation and normal gait on examination." [AR at 835.] Although he noted "limited range of motion due to muscle spasm," he otherwise stated: "there was no evidence of radiculopathy, no radiating pain to either side;" "[t]here is no numbness or weakness in lower extremities." [*Id.* at 834.] Dr. Laster further observed that she was "most consistent with mechanical back pain musculoskeletal spasm not radiculopathy." [*Id.*] He recommended that he "would continue with conservative management, weight loss, core strengthening, stretching continue the exercises outlined by physical therapy" and that "[n]othing seen on the MRI that would require more aggressive intervention." [*Id.* at 834.] His review of an MRI from UIC included "no evidence of any root impingement." [*Id.* at 836.] He noted a lack of evidence of radiculopathy on at least two occasions. See [*id.* at 834.]

[8] In July 2017, Plaintiff underwent a lumbar spine MRI. The MRI showed degenerated discs at L2-L3, L3-L4 and L4-L5 with discs protruding posteriorly," yet those discs had "no mass effect on the thecal sac or exiting nerve roots and the posterior facets were degenerated with narrowing and sclerosis." [AR at 587.]

[9] In June and July of 2017, Plaintiff underwent X-rays. Examinations of the X-rays, which showed "two views of the left knee," "reveal[ed] no evidence of fracture or dislocation," and that "the joint spaces are well maintained." [AR at 555.] "[N]o other abnormalities were seen," and she exhibited a "'normal' left knee." [*Id.*] An orthopedist's review of an X-Ray of the left hip and pelvis "fail[ed] to demonstrate any definite fracture or dislocation. No gross osseous abnormality is identified." [*Id.* at 621.] Imaging of Plaintiff's "pelvis and ap" were also taken and reviewed, showing "well preserved joint space circumferentially," [*id.* at 687,] and the doctor assessed "impingement anatomy but with overall well preserved joint space," [*id.* at 688.]

to exercise and hip/knee x-rays, which were within normal limits." [AR at 27.] The ALJ also noted that the findings "comport with the assessment" of the internal medicine consultative examiner, Dr. Weiss, who conducted a June 2017 examination.[10] Finally, she also noted that Plaintiff's "daily activities" are "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." Specifically, the ALJ explained that although Plaintiff "said she spends the whole day in her room watching television and does not perform any cooking, cleaning or laundry due to her pain," she "is able to exercise on a bike for 45 minutes at a time." [Id.] In addressing her mental health evaluations, the ALJ also noted that the psychological consultative examiner observed her not using a cane to and from the evaluation site. [Id. at 28.]

The ALJ acknowledged the medical opinions and prior administrative medical findings of Dr. Frances Baxley, the reports of the state agency consultants, which included James Hinchen,

---

[10] Consultative examiners for the Bureau of Disability Determination Services also documented Plaintiff's condition around this same period. On June 28, 2017, Dr. Weiss made observations concerning Plaintiff's hip, knee, and back. As to Plaintiff's lower extremities, Dr. Weiss noted "decreased range of motion in the left hip due to knee pain" and "decreased range of motion in both knees due to pain" as well as "both patella were tender and here is crepitation in the left knee." [AR at 552.] As to her back and spine, Dr. Weiss stated there was a "decreased range of motion in the lumbosacral spine due to pain and stiffness. Flexion limited to 80 [degrees], extension to 10 [degrees]." [Id. at 552.] But Weiss also noted "that straight leg raising is negative bilaterally." [Id. at 552.] As to her knee, Weiss's "clinical impression" was "marked decreased range of motion in the left knee" as well as "crepitation and tenderness in the patella." [Id. at 553.] However, again she noted as to her degenerative disc disease, "slight decreased range of motion in the lumbosacral spine. There were no abnormalities, no radicular findings." [Id.]

Weiss also made assessments about Plaintiff's gait and performance. Weiss observed that Plaintiff's "gait is normal gait without the use or need of an assistive device in order to ambulate" [Id. at 552.] And as to her degree of difficulty in performance, Dr. Weiss observed that Plaintiff's "[s]quatting and arising was done without difficulty;" Plaintiff could "bear weight with single leg balance bilaterally;" and "no obvious difficulty getting on and off the exam table. No difficulty with heel-walk." [Id. at 552.] Weiss' physical examination also indicated "no discomfort in moving about the exam room or getting on or off the exam table." [Id. at 551.] Finally as to her hands, Weiss indicated "[f]ull active range of motion at the shoulders, elbows and wrists bilaterally. No joint swelling, tenderness, warmth or erythema" and for her hands specifically, "grip strength is 5/5 in the right and * * * left with good effort. She could make a full fist and extend the hands fully. She can oppose the fingers bilaterally. There is no difficulty in doing fine and gross manipulation of fingers and hands bilaterally. No atrophy of the hand musculature was noted." [Id. at 552.]

11

M.D., a consultant who performed an assessment upon reconsideration, Deborah Albright, and the impartial medical expert, Dr. McKenna. According to the ALJ, Dr. Baxley's opinion that Plaintiff "could sit less than two hours, stand/walk less than two hours and requires unscheduled breaks every hour lasting 15 min" and that she "would be off task for one third of the workday and would be absent from work two days a month" was "not persuasive, as it is not supported by the medical evidence of record and the doctor appears to be relying on claimant's subjective symptoms." [AR at 28.] She reasoned that though Plaintiff "reported that she was in significant pain, Dr. Baxley often indicated the claimant did not appear to be in acute distress." [*Id.*]

In contrast, the ALJ found the state agency medical consultant and a reconsideration by a second agency medical consultant persuasive. James Hinchen, the initial consultant, stated that Plaintiff could "lift and/or carry twenty pounds occasionally and ten pounds frequently;" "stand and/or walk for six hours and sit for six hours total in an eight-hour workday;" and among other things, noted she could "frequently climb ramps or stairs, ladders, ropes or scaffolds, and could frequently stoop, kneel, crouch and crawl," pursuant to a July 2017 assessment. [AR at 28.] The ALJ found these assessments "persuasive, as it is consistent with the claimant's history of fibromyalgia and degenerative disc disease" and "light exertional limitations" supported "by the claimant's allegations of pain with unremarkable findings on examination including no synovial thickening, 5/5 strength, intact sensation and normal gait on examination." [*Id.* at 28–29.] A second assessment performed under reconsideration likewise assessed that Plaintiff could "stand and/or walk for six hours and sit for six hours total in an eight-hour workday" could "occasionally" climb and occasionally stoop, kneel, crouch and crawl. The ALJ found this "consistent" with Plaintiff's claims and found the light exertional limitations "supported" for the same reasons. [*Id.* at 39.]

The ALJ also found the impartial medical expert's opinion that Plaintiff was limited to light exertional work with various limitations persuasive. She reasoned that Dr. McKenna's opinion,

> is consistent with and supported by the record as a whole. Specifically, the claimant has complained of hip pain and the need for hip replacement, btu an x-ray of the left hip and pelvis from June 2017 was within normal limits. Additionally when the claimant was evaluated by an orthopedist in July 2017, he concluded that the claimant had 'some diffuse and somewhat inconsistent musculoskeletal pains around her hip but they do not reliably refer to the hip joint. The orthopedist deferred hip treatment and recommended the claimant to concentrate on her spine. The MRI of the lumbar spine, from July 2017, revealed some degenerative disc disease and facet arthritis, which Dr. McKenna opined was an age appropriate finding. Moreover, the EMG of the right side did not show any abnormalities of the right upper extremity and only subtle evidence of lumbar neuropathy. Finally, several office visits reports noted the claimant was in no acute distress upon examination.

[*Id.*]

Another aspect of the ALJ's determination regarding Plaintiff's physical pain is also relevant to this opinion. The ALJ found that Plaintiff could perform light work including "frequently * * * handle with the bilateral upper extremities." [AR at 24.] In reaching this conclusion, the ALJ considered Plaintiff's statement in her Adult Disability Report, dated October 2017, that her conditions affected "her ability to * * * use her hands" as well as her testimony that "she has widespread pain affecting her fingers, wrists, toes, upper back and lower back." [*Id.* at 25.] Again, with respect to the second step of her analysis, the ALJ disagreed with the severity of her symptoms. [*Id.* at 26.] The ALJ noted that in early 2018 Plaintiff was "recommended to use a right carpal splint pending an EMG, based upon a primary encounter diagnosis of carpal tunnel syndrome" but by March 2018 an EMG "did not reveal any corresponding abnormalities in the limb to support the assessment of carpal tunnel." [*Id.* at 26.] The ALJ further noted that her findings "comport" with Dr. Weiss, the internal medicine consultative examiner's June 2017 evaluation, which included Weiss's statement that:

> [u]pon physical examination, the claimant displayed full range of motion at the shoulders, elbows and wrists bilaterally. Grip strength was 5/5 in the right hand and 5/5 in the left hand with good effort. She could make a full fist and extend the hands fully. She could oppose the fingers bilaterally. There was no difficulty in doing fine and gross manipulation of fingers and hands bilaterally and no atrophy of the hand musculature was noted.

[*Id.* at 27.] The ALJ addressed the August 2018 assessment of Dr. Baxley, who stated that Plaintiff could "occasionally reach, handle and finger," but concluded that the opinion "is not persuasive, as it is not supported by the medical evidence of record and the doctor appears to be relying on claimant's subjective symptoms." [*Id.* at 28.] The ALJ also relied on the opinion of impartial medical expert Dr. McKenna, who opined that Plaintiff was limited to "frequent gross manipulation and frequent reaching." [*Id.* at 29.] The ALJ found Dr. McKenna's opinion "persuasive, as it is consistent with and supported by the record as a whole," including the "EMG of the right side" which "did not show any abnormalities of the right upper extremity." [*Id.* at 29.]

## 2. Mental Health Impairments

The ALJ reviewed Plaintiff's testimony (described in further detail below), the psychological consultative examinations, and medical records regarding her residual functional mental capacity. See [AR at 28–29.][11] She noted that Plaintiff had a history of depression and

---

[11] Also relevant to this opinion, with respect to step 2, the ALJ found her mental impairments "singly and in combination" do not meet the listed impairments. [AR at 22.] In the course of this analysis, the ALJ noted Plaintiff had "mild limitation" in "understanding, remembering, or applying information," and a "moderate limitation" in interacting with others. [*Id.* at 22–23.] The ALJ also found only a moderate limitation in "concentrating, persisting, or maintain pace." [*Id.* at 23.] This finding rested on the following:

> In the Function Report, the claimant said that her conditions affected her ability to concentrate and complete tasks. The claimant indicated that she could pay attention for thirty minutes. She said she typically does not complete tasks she begins. Upon examination, the claimant was often alert and oriented and demonstrated a logical and coherent thoughts process. Although the consultative examiner observed the claimant had some difficulties with sustained mental effort and concentration. Considering the overall evidence, the undersigned finds that the claimant has moderate limitations in the area of concentration, persistence, or maintaining pace.

14

prior suicide attempts in her teenage years and discussed Plaintiff's testimony that she "experienced depression due to her pain symptoms, crying spells and isolative behavior" and her daily activities, including that she spends "the whole day in her room watching television." [*Id.* at 25.] She further noted that Plaintiff had received a Bupropion prescription from her primary care provider but was not receiving counseling in July 2017 at the time of the psychological consultative examination. [*Id.* at 27–28.]

The ALJ described assessments from a July 2017 consultative examination with Jason King. The ALJ noted that his consultative examination described Plaintiff's "good attitude" and that she was "cooperative," "engaged and related relatively well." [AR at 27–28.] Her overall mood was "depressed with congruent effect" but she appeared "alert and oriented to person, place, time and situation." [*Id.* at 28.] The ALJ further observed that Dr. King indicated she "demonstrated a logical and coherent thought process and no psychosis or derailment of thought was observed," and further noted that her "cognitive abilities appeared to be generally intact with some difficulties with sustained mental effort, concentration and working memory." [*Id.*]

The ALJ further discussed a mental health assessment Plaintiff underwent when she sought counseling for depression in October 2017, during which she was diagnosed with major depressive disorder and unspecified anxiety disorder; a diagnostic evaluation in January 2018 which noted her "depressive disorder was moderate but stable;" and therapy progress notes dated October 2018 through January 2019 describing "unremarkable mental status findings." [AR at 28.] Ultimately, she reasoned that the above "findings support the reduced mental residual functional capacity." [*Id.*]

---

[*Id.*] Nevertheless, she noted that this assessment is used only "to rate the severity of mental impairments at steps 2 and 3," as opposed to the residual functional capacity assessment. [*Id.* at 23.]

The ALJ also considered the medical opinions and prior administrative medical findings. Addressing the state agency psychological consultants Gayle Williamson, Psy.D., and Melanie Nichols, Ph.D., the ALJ found that their assessments of Plaintiff as having "not severe" mental impairments and with "no limitations" concerning interacting with others, mild limitations in concentration, persistence, maintaining pace, and no limitations in adapting and managing herself were "not persuasive as they are not consistent with or supported by the record as a whole." [AR at 29–30.] Neither was Dr. Lynn Barnett's Global Assessment Functioning score, given deficiencies in the test that render it "not designed for adjudicative determinations." [*Id.*] The ALJ likewise determined that the prior administrative findings of two physicians who treated Plaintiff—John Ginter and Ellen Brown—were not persuasive. Ginter's findings were "not persuasive" because they were "inconsistent with or supported by the medical evidence of record" documenting "essentially normal mental status examinations by" Dr. Barnett and inconsistent within his own notes, dated October 2017. [*Id.*] The ALJ similarly found the opinion of Ellen Brown, LPC, "not persuasive as it is not supported by or consistent with the medical evidence of record" because Ms. Brown's own therapy progress notes "displayed some difficulties" but "generally demonstrated unremarkable mental status findings" including "alert and oriented functioning, well-groomed appearance, normal speech and cooperative behavior." [*Id.* at 30.]

In sum, based on her review of the evidence, with respect to Plaintiff's residual capacity function, the ALJ found that:

> the combined effects of the signs and symptoms from all of her impairments, including pain from her physical impairments, side effects from her medications, and decreased ability to concentrate from her mental impairments dictated that the claimant is limited to work involving simple, routine, and repetitive tasks and use judgment limited to simple work related decisions.

[AR at 31.] Further "the mental health evidence * * * supports finding the claimant has moderate limitations in interacting with others." [*Id.*] Nevertheless, she found that "further restricting is

16

unwarranted as her subjective complaints are only partially consistent with the objective medical evidence and there is no treating medical source statement to the contrary to consider and weigh." [*Id.*]

Shifting finally to Step 5, having found that the agency shouldered its burden to show sufficient jobs in the economy that matched her capacity to perform light work, the ALJ ultimately concluded that Plaintiff has not been under a disability within the meaning of the Social Security Act from April 20, 2017, through the date of decision. [AR at 18.]

## IV. Legal Standard

The Social Security Act authorizes judicial review of the final decision of the SSA. 42 U.S.C. § 405(g).[12] An ALJ's decision "must be upheld if it is supported by substantial evidence, which has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Ghiselli v. Colvin*, 837 F.3d 771, 776 (7th Cir. 2016) (quoting *Pepper v. Colvin*, 712 F.3d 351, 631 (7th Cir. 2013)). "[A]n ALJ must articulate, at a minimum, his analysis of the evidence to allow a reviewing court to trace the path of his reasoning and be assured that he considered the important evidence." *Gravina v. Astrue*, 2012 WL 3006470, at *3 (N.D. Ill. July 23, 2012) (citing *Young*, 362 F.3d at 1002). The ALJ is not required to address every piece of testimony and evidence but must "provide some glimpse into the reasoning behind [the] decision to deny benefits." *Id.* In other words, the ALJ must build "an accurate and logical bridge" from the evidence to her conclusion. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (citation and internal quotation marks omitted).

---

[12] Because the Appeals Council denied Plaintiff's request for review, the Court evaluates the ALJ's decision "as the final word of the Commissioner of Social Security." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018).

A court reviews the entire administrative record but does not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (citation and internal quotation marks omitted). If reasonable minds can differ as to whether the applicant is disabled, the court must uphold the decision of the ALJ. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).

Federal courts have the statutory power to affirm, reverse, or modify the SSA's decision, with or without remanding the case for further proceedings. 42 U.S.C. § 405(g); *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011). Thus, the Court may remand the case with instructions for the Commissioner to calculate and award benefits to the applicant. *Id.* at 415. However, an award of benefits if appropriate "only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits." *Id.* "If the [ALJ's] decision lacks adequate discussion of the issues, it will be remanded." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

## V.    Analysis

Plaintiff seeks reversal of the decision of the ALJ on five bases, all of which appear to concern the ALJ's evaluation of Plaintiff's residual functional capacity to perform light work. According to Plaintiff, the first two sources of error relate to the ALJ's failure "to properly evaluate Plaintiff's Physical Residual Functional Capacity." [23 (Pl. Br.) at 3.] Plaintiff takes issue with two dimensions of the ALJ's physical residual functional capacity finding: her use of a cane and use of her hands. Third, and relatedly, Plaintiff asserts that the ALJ did not properly evaluate her mental residual functional capacity. According to Plaintiff, the ALJ's findings were not supported by substantial evidence because the ALJ relied on her "lay medical opinions." [*Id.* at 11.] Fourth, Plaintiff contends that the ALJ did not properly consider the opinion of Plaintiff's physician, Dr.

18

Frances Baxley. [*Id.* at 11–13.] Fifth, Plaintiff contends that the ALJ erred by improperly discrediting Plaintiff's subjective symptoms. [*Id.* at 14.] The agency opposes all of Plaintiff's grounds for reversal, arguing that the ALJ's decision is supported by substantial evidence and reasonably explained.

While the Court acknowledges the ALJ's thorough opinion and extensive discussion of Plaintiff's medical records in evidence and finds it adequate (and even persuasive) in many respects, the Court agrees with Plaintiff on her final—but no less critical—complaint. Namely, the ALJ has not adequately explained her reasons for discrediting Plaintiff's subjective allegations of her pain. Left without a sufficient explanation for rejecting Plaintiff's account of her severe pain, this Court cannot meaningfully review the ALJ's derivative finding that Plaintiff can engage in light work. Thus, this Court will begin at the end, discussing why the ALJ did not adequately explain why she discredited Plaintiff's subjective allegations. Then the Court will briefly address Plaintiffs' first four criticisms of the ALJ's residual functional capacity assessment as to Plaintiff's use of a cane, use of her hands, mental health, and discussion of Dr. Baxley's assessment. Although the Court agrees with the agency that many steps leading to the ALJ's decision are supported by substantial evidence, the ALJ's ultimate conclusions are too entangled with her credibility determination of Plaintiff to exempt them from the reassessment on remand. The Court thus directs the ALJ to revisit her findings regarding the severity of Plaintiff's symptoms and discuss how, if at all, her enhanced credibility determinations affect her physical and mental residual capacity findings.

## A. Weight Afforded to Plaintiff's Subjective Symptoms

As noted above, the Court begins with Plaintiff's most persuasive argument; namely, that the ALJ erred in her credibility determination. The Court must begin with Plaintiff's final

argument because the ALJ's determinations about Plaintiff's residual functional capacity as to her physical and mental impairments appear to turn, at least in part, on her evaluation of Plaintiff's subjective symptoms.

In wrapping up her brief, Plaintiff raises an issue that also underpins the view—stated throughout her brief—that the ALJ failed to properly address why she discredited Plaintiff's subjective allegations of debilitating and intermittent pain. [23 (Pl. Br.) at 14.] Defendant disagrees, arguing that "[t]he ALJ reasonably evaluated plaintiff's subjective symptoms, and found her subjective complaints were not entirely consistent with the medical evidence and other evidence (Tr. 24-28)." [30 (Def. Opp. Br.) at 17.]

The Court agrees with Plaintiff that the ALJ's discrediting of Plaintiff's allegations precludes meaningful appellate review. The Court will therefore first describe Plaintiff's testimony at the 2019 ALJ Hearing, then elaborate on the ALJ's 2019 decision, and finally explain the basis for its conclusion that the ALJ did not provide an adequate explanation for discounting Plaintiff's contentions and the support provided for them.

### 1.    ALJ Hearing – Plaintiff's Testimony

Recall that Plaintiff was one of three witnesses who testified at the ALJ hearing in 2019. During the hearing, the ALJ asked Plaintiff about her work history, symptoms, and daily activities. Plaintiff testified that she feels she is unable to work because at her position with the elementary school she started feeling "every day – it was hard to get out of bed" because her "body was aching all the time." [AR at 52.] The final straw came during the work when she was summoned to attend to a child:

> I couldn't run. I almost, like, fell, and everything was hurting so bad, so I'm walking real fast, and then they did a second call. They never had to do that. They was like nurse to the lunchroom. And I'm trying to get there as fast as I could, and that was actually my breaking point of, like, I can't do this, and like, they shouldn't have to

> call me twice. But I was trying to get that, just to get to the end of the school quick
> enough, and then once I got get the child and to assess the situation, I can barely
> get up. I didn't want nobody to know what was going on with me, and I was in
> excruciating pain. I remember going back to my office and just going in the
> bathroom and crying because I didn't know what was wrong. And my doctor
> couldn't give me any answers until they eventually found out and said that I had
> fibromyalgia and that my hip needed a replacement. And so I was -- you know, the
> depression got worse due to all of that, and I ended up resigning, because I didn't
> want to get fired.

[*Id.* at 52–53.]

Plaintiff elaborated on these symptoms, explaining that she has widespread pain affecting
her fingers, wrists, toes, upper back and lower back. She described "pain everywhere" including
her fingers, wrists, toes, "everything" and that "the whole body just aches," that feels like "arthritis,
like all over my whole body. My upper back lower back, everything hurts." [AR at 53.] Plaintiff
stated that she was prescribed Lyrica for pain symptoms, which she said affect the frequency of
the flare-ups, "from becoming so often," [*id.*] but also causes fatigue, [*id.* at 54.] She further
testified that the University of Illinois told her she needed her left hip replaced. [*Id.* at 53.] When
Plaintiff started experiencing pain, she underwent an X-ray and was told it was "more like bone"
and was put in "water therapy" and was supposed to go for surgery but was scared of doing so.
[*Id.* at 54.] Plaintiff described having "good days" and "bad days"—on her good days her pain
level is a "four," and she:

> can go maybe six days, five days and I'm at a good day. All of a sudden, a bad day
> is when it gets higher than that, and then that's when I'm actually in bed, and that's
> a bad day where I can't get out of bed. And it hurts to just get up to go to the
> washroom, which is just steps away from my bed. That's a bad day.

[*Id.* at 59–60.]

Regarding her daily activities, Plaintiff testified that she spends her days in her room,
"basically in [her] room, watching television." [AR at 56.] She does not do chores around the
housing, such as cooking, cleaning, or laundry "because [she is] in pain." [*Id.* at 56–57.] She

explained that "for me to go downstairs to have to do [chores] is too much of a task" because it entails "bend[ing] down and get[ting] up high" or "standing up to do the dishes." [*Id*.] She indicated that if it's a "good day" she can prepare her meals, but if it is not, her husband stays home to take care of her. [*Id*. at 57.] On a "good" day she can only walk for about one-half of a block and stand for about fifteen minutes, sit for about fifteen to thirty minutes because "a shooting pain runs down [her] hip to [her] – all the way down to [her] calf" and her "back hurts really bad from switching positions, and it'll start getting numb" and she will "lose feelings in [her] legs." [*Id*. at 59.] She also testified that the most she can lift is lift one gallon of milk. [*Id*.] She goes grocery shopping but with someone to help and uses an electric cart in the store. [*Id*. at 57.] She testified that she drives "maybe twice a month" and has difficulty driving "if I have a flare-up and my wrists are hurting, it'll – it's hard for me to steer the wheel. If my hip is hurting, pressing on the pedal hurts." [*Id*. at 49.]

As to her mental health, Plaintiff stated that she suffers from depression due to her pain symptoms. She experiences crying spells, isolative behavior, and she has been seeing a mental health therapist, Evelyn Brown, since around August 2018. [AR at 54.] She testified that she no longer takes antidepressants due to negative side effects but rather takes over the counter vitamins and St. John's Wort. [*Id*. at 55.] She testified that she experiences depression and anxiety that is "due to [her] pain," when she will isolate in her room, and also suffers from "periods where anxiety comes and just comes out of nowhere" with her heart "racing, and [she is] nervous and scared" and does not want to go anywhere. [*Id*. at 55–56.] When asked if the vitamins and John's Wort she takes help, she remarked that "it doesn't help all the way, but it – I'm not sad every day like I was." [*Id*. at 56.]

She also testified that she has issues recalling what she reads although she remembers what she watches on television.  [AR at 58.]  She speaks with friends and family regularly and will on occasion go to church on a Sunday on a good day.  [*Id.*]

Plaintiff also discussed the use of a cane.  She testified that she started using a cane in October 2017, prescribed by her doctor.  [AR at 60.]  She uses it "as needed" but the amount varies from "six days, like straight days" to "once out of the week" based on whether she's "hurting really bad."  [*Id.*]  She also has a walker that she uses when she is at home.  [*Id.* at 61.]

### 2. ALJ Decision

In evaluating the severity of Plaintiff's symptoms, the ALJ concluded that "the claimant's statements about the intensity, persistence, and limiting effects of her symptoms * * * are inconsistent because the alleged impairments are not supported by medical records to the extent alleged."  [AR at 26.]  The ALJ then proceeded to walk through the assessments of various providers, discussed above, showing mixed results as to a single source of her physical pain.  The ALJ explained that Plaintiff's description of her "daily activities:"

> are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. As noted above, the claimant said that she spends the whole day in her room watching television and does not perform any cooking, cleaning or laundry due to her pain. (Hearing Testimony). However, the treatment records documents that she is able to exercise on a bike for 45 minutes at a time. (11F/11). These activities are not consistent with the claimant's allegations of disabling limitations.

[*Id.* at 27.]

### 3. Present Motion

In her motion before this Court, Plaintiff seeks reversal on the basis that the ALJ erred in her credibility determination that Plaintiff suffers from crippling pain and therefore has the residual functional capacity to perform light work.

In *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004), the Seventh Circuit addressed the tension in cases in which a claimant claims to be disabled from working because of extreme pain. Such cases require the ALJ to reconcile the fact that "[m]edical science confirms that pain can be severe and disabling even in the absence of 'objective' medical findings, that is, test results that demonstrate a physical condition that normally causes pain of the severity claimed by the applicant." *Id.* In recognition of this fact, "once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." *Id.* (citing *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir.1996)). "A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability." *Id.* Nevertheless, this fact "invites the unscrupulous applicant to exaggerate his or her pain without fear of being contradicted by medical evidence. The administrative law judge must be alert to this possibility and evaluate the applicant's credibility with great care." *Id.*

In recognition that an ALJ "is 'in the best position to determine a witness's truthfulness and forthrightness * * * [the] court[s] will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310–11 (7th Cir. 2012) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 504–05 (7th Cir.2004)). Therefore, courts ask "whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008). A credibility determination is patently wrong "when the ALJ's determination lacks any explanation or support." *Id.* More to the point, "the ALJ may not simply ignore evidence." *Myles v. Astrue*, 582 F.3d 672, 676 (7th Cir. 2009) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 540 (7th Cir. 2003)). Rather:

The ALJ must consider a claimant's subjective complaint of pain if supported by medical signs and findings. And even if the claimant's complaint is not fully supported by objective medical evidence, the court has instructed:

If the allegation of pain is not supported by the objective medical evidence in the file and the claimant indicates that pain is a significant factor of his or her alleged inability to work, then the ALJ must obtain detailed descriptions of claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work record information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for the relief of pain, functional restrictions, and the claimant's daily activities.

Although an ALJ's credibility determination is usually entitled to deference, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision."

*Clifford*, 227 F.3d at 871–72 (internal citations and footnote omitted).

*Clifford* is instructive. In *Clifford*, the Seventh Circuit agreed with the appellant's argument that the ALJ improperly evaluated her testimony regarding disabling pain. 227 F.3d 863 (7th Cir. 2000). The Court overturned the ALJ's "conclusory" statement that the plaintiff's "testimony regarding the limitations placed on her daily activities was unsupported by the medical evidence." *Id.* at 872. The plaintiff had "sought medical treatments for pain symptoms" on multiple occasions, and the ALJ did not sufficiently explain why the objective medical evidence did not support her complaints of pain. *Id.* at 872. The ALJ's mere "list[ing] [the plaintiff's] daily activities * * * d[id] not establish that a person is capable of engaging in substantial physical activity." *Id.* Without a "sufficient basis upon which to uphold the ALJ's credibility determination," the Seventh Circuit remanded with instructions to reevaluate the plaintiff's complaints of pain with due regard for the "full range of medical evidence." *Id.* Compare *Myles*, 582 F.3d at 676 (remanding for reconsideration where the ALJ's basis for his credibility

determination was incorrect), *Bates v. Colvin*, 736 F.3d 1093 (ALJ's credibility determination for mental health impairment improperly rested on "cherry-picked" statements from doctor's notes), with *Simila v. Astrue*, 573 F.3d 503, 518 (7th Cir. 2009) (upholding credibility determination resting on "a host of facts upon which to base her opinion that [the plaintiff] overstated his symptoms" including evidence the plaintiff engaged in tasks that "requi[red] extended physical exertion," such as building a log home and frequently going hunting and fishing).

Here, the ALJ's credibility determination is "patently wrong" because it lacks an adequate explanation for discrediting Plaintiff's testimony about her severe and debilitating intermittent pain. Just like in *Clifford*, the ALJ has not elaborated on the "apparent conflict" between the objective medical evidence and Plaintiff's testimony. Although on a surface level, the ALJ walks through the treatment observations of multiple physicians to find a lack of objective medical evidence, there is little or no support or explanation for why each of these physicians' observations constitutes an inconsistency with Plaintiff's own account of severe, disabling pain. For example, the ALJ describes her assessments of various physicians who treated Plaintiff throughout 2017 and 2018 and implies that Plaintiff is in no pain because her "antalgic gait and limited range of motion in the lumbar spine and left hip" was inconsistent with "intact sensation or negative leg raises." Yet, the ALJ offers no reason or evidence for why those two statements are contradictory. [23 (Pl. Br.) at 14.] See *Carradine*, 360 F.3d at 755–56; *Moore v. Colvin*, 743 F.3d at 1125 (applying the principles of *Carradine* to conclude that the ALJ erroneously rejected the plaintiff's "testimony on the basis that it cannot be objectively verified with any reasonable degree of certainty.")

The observation that Plaintiff appeared in "no acute distress" upon examination on multiple occasions likewise is incomplete and thus ultimately unconvincing because Plaintiff alleges that her pain was intermittent. The ALJ has not explained—nor attempted to explain—how to

reconcile the fact that Plaintiff described pain and mental anguish that ebbed and flowed between "good" and "bad" days with the obvious fact that those physicians recorded her pain level at single moments, on isolated occasions. See *Scrogham v. Colvin*, 765 F.3d 685, 696 (7th Cir. 2014) (criticizing ALJ's failure to wrestle with the progressive nature of the claimant's symptoms, which "wax[ed] and wan[ed]" with time). The intermittent nature of her symptoms required particular emphasis because the record is replete with Plaintiff seeking out help from multiple providers. Unlike the plaintiff in *Elder v. Astrue*, for example, Plaintiff did not shift her story but rather consistently conveyed—to different providers, over the course of two years—that she was incurring the same symptoms. See 529 F.3d at 413 (affirming denial of review and upholding credibility determination because the ALJ gave a "reasoned" explanation for finding incredible the claimant's testimony about the severity of her fibromyalgia and depression where her testimony that she could not exercise and was largely confined to her bed was contradicted by what she told her treating doctor).

The agency's contention that the ALJ based her credibility determination on Plaintiff's "conservative" course of treatment also falls short of a reasonable explanation. Recall that the ALJ commented that Plaintiff had not undergone a TENS unit nor was surgery needed. But these observations do not undermine Plaintiff's credibility because the record contains no evidence that "such treatment was suitable for [her] impairments or that the lack of such treatment correlated to a lesser degree of severity." [23 (Pl. Br.) at 14.] Taking Plaintiff's point a step further, it seems at least *possible* that no treatment modalities were effectively available to Plaintiff, either as a matter of science or otherwise. See *Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014) ("an ALJ 'must not draw any inferences' against claimant for lack of treatment without inquiring into factors such as the claimant's ability to pay and whether she has structured daily activities 'so as

27

to minimize symptoms to a tolerable level.'" (quoting SSR 96-7.))  Just as the fact that Ms. Beardsley decided not to have surgery was not a sufficient basis to discount the assessing physician's opinion, the ALJ here ran the risk of punishing Plaintiff for a gap in the extant treatment.

The ALJ also did not provide an adequate "logical bridge" between the reasons she gave for discrediting Plaintiff's account of her daily activities and the record evidence she relied on, thereby effectively overlooking an entire line of testimony.  Like the claimant in *Clifford*, Plaintiff testified that her "bad days" are completely debilitating.  Not only did she recount that she spent entire days in bed, but also noted that she cannot perform simple tasks like cooking, cleaning, or grocery shopping on her own.  Even on good days, Plaintiff testified that she cannot walk further than a few blocks and, even then, requires a fifteen-minute break.  That is a far cry from the "extended physical exertion" that might cast into doubt a claimant's account of the pain in her hip, knee, and back.  See *Simila*, 573 F.3d at 518.

Nor is it an answer to say that the ALJ's credibility determination was adequately explained because the ALJ noted that Plaintiff rode an exercise bike for forty-five minutes on a single occasion.  An isolated incident cannot suffice in building a logical bridge between Plaintiff's conduct and the view that she could perform full time work.  See *Scrogham*, 765 F.3d at 701 ("[r]eports of [the plaintiff's] walking simply are too thin a reed on which to rest a determination that there is substantial evidence supporting the ALJ's conclusion that he could return to full-time work.")  In fact, the Seventh Circuit has rejected such "extreme example[s] of a problem [the appellate court] ha[s] long bemoaned, in which administrative law judges have equated the ability to engage in some activities with an ability to work full-time, without recognition that full-time work does not allow for the flexibility to work around periods of incapacitation."  *Moore*, 743 F.3d

28

at 112 (reversing ALJ determination that the plaintiff's incapacitating migraines once per week would not impede her from working full time because she spent "most" of the week without symptoms.)  That is because this type of leap ignores the "critical difference between daily living activities and activities of a full time job"—that "the former person has more flexibility in scheduling, can get help from others when needed, and is not held to a minimum standard of performance."  *Id.* See, *e.g.*, *Stark v. Colvin*, 813 F.3d 684, 688 (7th Cir. 2016) ("We have repeatedly rejected" the reasoning that the plaintiff can do household chores "as 'naïve,' because a person performing chores has flexibility in scheduling, can receive help, and is not held to a minimum standard of performance, unlike an employee" (citation omitted.))

## B.    Physical Residual Functional Capacity – Use of Cane

That brings the Court to Plaintiff's remaining arguments, which concern the ALJ's ultimate residual capacity findings as well as her evaluation of the assessments of Dr. Baxley, Plaintiff's treating physician.

First, Plaintiff takes issue with two dimensions of the ALJ's finding regarding Plaintiff's physical residual functional capacity.  Plaintiff criticizes the ALJ for omitting the "use of a cane" in her physical residual functional capacity finding.  [23 (Pl. Br.) at 4.]  Plaintiff says that finding is not supported by substantial evidence in the record.  [*Id.* at 5.]  In Plaintiff's view, remand is required "to properly evaluate [Plaintiff's] use of a cane, and if required, to evaluate if work at any exertional level would be available with such a limitation" and the ALJ's failure was not harmless because it would have affected what work she could perform.  [*Id.* at 5–6.]  The argument goes that the ALJ found Plaintiff could do light exertional level work, but if Plaintiff used a cane for ambulation and balance, then she could not do "light exertional level," according to the vocational expert.  [*Id.*] (citing AR 82.)

29

The Commissioner disagrees, directing the Court's attention to substantial evidence in the record to support the ALJ's finding and discusses the ALJ's weighing of the opinions of impartial medical expert James McKenna, M.D. and the consultative examiner, among other things. [30 (Def. Opp. Br.) at 3–5.] In reply, Plaintiff characterizes her argument as twofold: (1) the ALJ relied on certain evidence "without explaining why she believed it to be more reliable than evidence to the contrary," [31 (Pl. Reply Br.) at 1,] and (2) none of the evidence on which the ALJ relied "was inconsistent with [Plaintiff's] allegations of the need for a cane at times," [*id.* at 2.]

Recall that before proceeding to Step 4, the ALJ evaluated Plaintiff's residual functional capacity and found that Plaintiff could:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: climb ladders, ropes or scaffolds; occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; never be around unprotected heights, dangerous heavy moving machinery and heavy vibration; frequently push and pull, reach in all directions and handle with the bilateral upper extremities; understand, remember and carryout [*sic*] simple routine tasks and use judgment limited to simple work related decisions; and frequent interaction with supervisors, coworkers and the general public.

[AR at 30.]

Having reviewed the ALJ's thorough account of the extensive record evidence of Plaintiff's physical assessments, the Court concludes that the ALJ's omission of the cane as medically necessary is supported by substantial evidence. As for the substantial basis standard, the ALJ relied on the medical examinations of Plaintiff's own providers as well as objective diagnostic tests and studies described in detail.[13] This medical evidence more than satisfies the substantial evidence standard.

---

[13] Medical examinations conducted by multiple providers who saw Plaintiff throughout 2017 and 2018 consistently revealed mixed results: despite some limits to her range of motion, Plaintiff had no radiculopathy, negative bilateral straight leg raise testing, a normal gait, no synovial thickening, and did not appear to be in acute distress. The ALJ's determination was also supported by the evidence from Plaintiff's rheumatologist and neurologist, whose results observed limited issues regarding her left hip, knee, and

Nevertheless, the ALJ's opinion still gives this Court pause. The Court cannot engage in meaningful appellate review without an adequate explanation of why the ALJ discredited Plaintiff's subjective accounts of her pain, and how those subjective accounts weigh against the objective medical evidence in the record. The ALJ's decision appears to turn—at least in part— on her credibility determination. For example, she takes into account that Plaintiff rode a stationary bike and found unpersuasive Dr. Baxley's medical assessments regarding Plaintiff's "left knee crepitus, joint line tenderness, diminished sensation in the bilateral feet, diffuse tenderness to palpation along the back and joints, positive tender points, and limited range of motion in the left hip, bilateral knees, and lumbar spine." [23 (Pl. Br.) at 4] (citing AR 514, 552,

---

spine. Objective diagnostic tests and studies, including a July 2017 lumbar spine MRI, X-ray imaging of her hip and knee, and a March 2018 EMG further reinforces this Court's view that the ALJ had substantial support for her omission of the use of a cane from her findings.

None of Plaintiff's arguments to the contrary undermine this Court's conclusion that the ALJ's decision was supported by the record. Namely, in Plaintiff's view, the ALJ erred by "rel[ying] on the opinion of a medical expert," Dr. McKenna. [23 (Pl. Br.) at 4.] (Footnote continues on next page …)

Plaintiff's contention that the ALJ relied on the medical expert in contradiction over other record evidence misses the mark. Specifically, she points to record evidence that she used a cane as needed: her own treating physician prescribed a four-point cane for assistance with walking as needed; that she and her aunt both reported she used the cane; and that she reported her use of the cane to multiple providers. [23 (Pl. Br.) at 4.] And a prescription "does not necessitate that a provision for use of a cane be provided in the RFC" especially here because "the ALJ sufficiently explained her reasons for finding that use of cane was not necessary" through her discussion of various providers, impartial medical assessments of Dr. Weiss, and the X-ray, EMG, and MRI imaging. [30 (Def. Opp. Br.) at 5.]

Failing that, Plaintiff presses that the medical expert who testified at the ALJ hearing did not examine Plaintiff in person. But the medical expert drew on record evidence prepared by multiple providers who *did* examine Plaintiff, in person, and over time, including her primary care physician, rheumatologist, orthopedist, and neurologist.

As backstop, Plaintiff recites the evidence that she believes supports her claim that she requires a cane. Specifically, Plaintiff points to the records from various providers indicating "left knee crepitus, joint line tenderness, diminished sensation in the bilateral feet, diffuse tenderness to palpation along the back and joints, positive tender points, and limited range of motion in the left hip, bilateral knees, and lumbar spine." [23 (Pl. Br.) at 4] (citing AR 514, 552, 582, 586, 600, 879.) The argument that the ALJ glossed over these facts does not alter this Court's conclusion because, as Defendant points out, this "is nothing more than a contention that [s]he would have weighed the evidence differently." [30 (Def. Opp. Br.) at 5.]

582, 586, 600, 879.)  In other words, there is a very real possibility that the ALJ's ultimate finding regarding Plaintiff's credibility determination influenced her physical residual capacity finding.

Thus, the Court directs the ALJ to revisit the physical residual capacity finding—in particular with respect to Plaintiff's use of a cane—upon remand and explain how, if at all, her credibility determination affects her physical residual capacity finding.  Importantly, the Court does not—nor could it—direct the ALJ to come to any specific conclusion regarding these determinations upon remand.  However, the Court must be sure that the ALJ has properly considered Plaintiff's own subjective allegations of her pain in the process of weighing the record evidence.  See, *e.g.*, *Moore*, 743 F.3d at 1126 ("That does not mean that the ALJ was required to credit [the plaintiff's] testimony. The ALJ could properly have considered whether [plaintiff's] testimony was credible and whether the evidence supported such limitations * * * . The error here is the same failure to address the evidence in a balanced manner.")

### C.    Physical Residual Functional Capacity – Hands

In her brief, Plaintiff contends that the ALJ also erred by finding that she was limited to frequent handling.  [23 (Pl. Br.) at 6.]  Pointing to SSR-96-8p and SSR16-3, she contends that "[t]he ALJ did not explain why Plaintiff's allegations of significant hand pain and limited use of the hands were not consistent with the diagnosis, physical exam, and the opinions of the treating physician" and "absent this explanation, the ALJ's findings were unsupported."  [23 (Pl. Br.) at 7.]  Defendant disagrees, pointing to Dr. Weiss's findings and the ALJ's explanation that Dr. Baxley's opinion was not persuasive because it appeared to rely on Plaintiff's "subjective symptoms."  [30 (Def. Opp. Br.) at 6–7.]

The Court agrees with Defendant that the limitation to frequent handling was supported by substantial evidence in the record, including the assessments of Dr. Weiss, Dr. McKenna, and the

2018 EMG. The ALJ drew on Dr. Weiss's assessment that Plaintiff had full range of motions at the shoulders, elbows and wrists bilaterally, that her grip strength was 5/5 (normal) in both hands with good effort, that she could make a full fist and extend the hands fully, she could oppose the fingers bilaterally, and there was no difficulty in doing fine and gross manipulation of fingers and hands bilaterally, and no atrophy of the hand musculature was noted.

Nevertheless, as with the use of the cane finding, the ALJ's explanation of the evidence appears inextricably intertwined with her credibility assessment. Plaintiff emphasizes that she suffers from finger and wrist pain and is unable to use her hands during fibromyalgia flareups. [23 (Pl. Br.) at 6] (citing AR 53, 62–63). In her view, her allegations were "consistent with the record" for four reasons: her fibromyalgia diagnosis, her reports of "body pain, difficulty using her hands, morning hand stiffness and burning sensation in the hands," and the statement of her treating doctor, Dr. Baxley, who opined she "could use her hands for 20 percent of the workday." [23 at 6–7.] Thus, the ALJ's credibility assessment appears to permeate her ultimate finding that Plaintiff could engage in frequent handling. Upon remand, the ALJ should therefore consider and explain how her credibility finding affects her conclusions with respect to Plaintiff's use of her hands.

### D. Mental Residual Functional Capacity – Mental Health

In regard to mental health, Plaintiff similarly argues that the ALJ did not properly evaluate her mental residual functional capacity. As to Plaintiff's psychological impairments, recall that the ALJ found at Step 3 that Plaintiff's depression and anxiety qualified as severe impairments. [AR at 20.] In her motion [23], Plaintiff asserts that the ALJ's findings as not supported by substantial evidence because the ALJ relied on her "lay medical opinions" to formulate the residual capacity function finding. [23 (Pl. Br.) at 11.] In reply, she adds that the ALJ and Commissioner failed to "credit[]" Plaintiff's allegations and "did not credit any record evidence that suggested

Plaintiff was limited specifically as assessed in the ALJ's RFC determination" [31 (Pl. Reply) at 3] (emphasis added.)  She asks: "how does an ALJ know the record evidence indicated mental limitations including understanding, remembering, and carrying out simple routine tasks, judgment for simple work-related decisions, and frequent interaction with supervisors, coworkers, and the public."  [*Id.*]  Failing that, she contends that the residual functional capacity limitations "did not address Plaintiff's moderate difficulties with concentration, persistence or pace."  [31 (Pl. Reply ) at 4.]

As to her first argument, Plaintiff contends that the ALJ rejected the expert authority before her, and in the absence of any persuasive testimony, it was inappropriate to "rel[y] only on her own lay opinion to support her RFC determination" in that Plaintiff is limited to "simple, routine, and repetitive tasks and use judgment related to simple work-decision making" based on her combined impairments, including her pain and "decreased ability to concentrate." [31 (Pl. Reply Br.) at 3.]  Plaintiff is relying on process of elimination: the ALJ rejected the expert authority, which in her view left no other "doctor or mental health authority" to support the ALJ's assessment and so that leaves only the ALJ's "unsubstantiated" lay opinion. [23 (Pl. Br.) at 8–9.]

The Court disagrees.  The ALJ's findings that Plaintiff would have "decreased ability to concentrate" are supported by substantial evidence.  Those authorities, as summarized above, include a discussion of the psychological consultative examination of Dr. King, an October 2017 mental health assessment, a January 2018 diagnostic evaluation, and October 2018 through January 2019 therapy progress notes.  [30 (Def. Opp. Br.) at 8.]

To be sure, the ALJ did reject the findings of a subset of the consultative examiners and providers.  The ALJ reasoned that the opinions of Williamson and Nichols that Plaintiff only had mild limitations in concentration, persistence, maintaining pace and no limitations in adapting and

managing herself were "not persuasive as they are not consistent with or supported by the record

as a whole." [AR at 29–30.] However, Plaintiff's view that the ALJ relied on no "expert authority"

and "did not credit *any record evidence*" is belied by the fact that the ALJ specifically discussed

Dr. King's assessment," [*id.* at 34, 28,] that Plaintiff "demonstrated a logical and coherent thought

process" and displayed "no psychosis or derailment of thought," [*id.* at 560.] The ALJ also based

her findings on Dr. King's testimony that Plaintiff's "cognitive abilities appeared to be generally

intact with some difficulties with *sustained mental effort, concentration and working memory*."

[AR at 560.] As such, there is no support for the proposition that the ALJ filled in the absence of

expert authority by simply supplanting her own "lay opinion."

Nevertheless, as with the ALJ's residual capacity finding regarding Plaintiff's physical

impairments, the Court directs the ALJ to consider whether her weighing of evidence shifts at all

upon further consideration, analysis, and explanation of Plaintiff's subjective allegations of her

concentration challenges.

### E.      Weight Afforded to Dr. Frances Baxley's Opinions

That brings the Court to the ALJ's treatment of the assessment of Plaintiff's primary care

physician, Dr. Frances Baxley, M.D. Recall that the ALJ acknowledged she had "fully considered

the medical opinions and prior administrative medical findings" including that of Dr. Baxley.

Specifically, the ALJ stated:

> In August 2018, Dr. Frances Baxley, M.D., assessed that the claimant could sit less
> than two hours, stand/walk less than two hours and requires unscheduled breaks
> every hour lasting 15 min. (29F/2). Dr. Baxley opined the claimant could rarely lift
> and/or carry twenty pounds, and occasionally lift and/or carry ten pounds or less,
> and occasionally reach, handle and finger. (29F/2). Dr. Baxley concluded the
> claimant would be off task for one third of the workday and would be absent from
> work two days a month. (29F/1, 3). This opinion is not persuasive, as it is not
> supported by the medical evidence of record and the doctor appears to be relying
> on claimant's subjective symptoms. Specifically, even though the claimant reported

that she was in significant pain, Dr. Baxley often indicated the claimant did not
appear to be in acute distress on examination (11F/2, 7, 11, 14, 17).

[AR at 28] (citations omitted.)

Plaintiff argues that the ALJ did not properly consider the opinion of her Dr. Baxley. As
Defendant points out, the "treating source rule," see 20 C.F.R. § 404.1527, does not govern
Plaintiff's claims, because new regulations were in effect at the time of her application. See
*Burmester v. Berryhill*, 920 F.3d 507, 511 n.1 (7th Cir. 2019). "[T]he Social Security
Administration gave additional guidance that reviewing courts should apply the regulation that
was in force when the ALJ made his decision." See Evaluation of Symptoms in Disability Claims,
82 Fed. Reg. 49463, 49463-4 (Oct. 25, 2017)). The applicable regulations, 20 C.F.R. §§ 1520b
and 1520c differ from the previous regulation in that the agency no longer has a "treating source
rule" deferring to treating source opinions. 82 Fed. Reg. 5844, 5853 (Jan. 18, 2017). Rather, the
agency "will not defer or give any specific evidentiary weight, including controlling weight, to
any medical opinion(s) or prior administrative medical finding(s), including those from [the
claimant's own] medical sources." 20 C.F.R. § 404.1520c(a). Nor do the regulations governing
this case mandate the "controlling weight" analysis or the "good reasons" standard in weighing a
treating source opinion. Compare 20 C.F.R. § 404.1527(c)(2), with 20 C.F.R. § 404.1520c(a), (b).
The ALJ is only required to explain how she considered the supportability and consistency factors,
which are the two most important factors in determining the persuasiveness of a medical source's
opinion or a prior administrative medical finding. 20 C.F.R. § 404.1520c(b)(2). As for
supportability, "[t]he more relevant the medical evidence and supporting explanations presented
by a medical source are to support his or her medical opinion(s) * * * the more persuasive * * *
the finding(s) will be." See 20 C.F.R. § 404.1520c(c)(1)(2017). As for consistency, under
§ 404.1520c(c)(2) (2017), "the more consistent a medical opinion * * * is with the evidence from

other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) * * * will be."

The Court disagrees with Plaintiff that the ALJ improperly evaluated Dr. Baxley's opinions because the ALJ appropriately followed the requirements of 20 C.F.R. § 404.1520c(b)(2) by considering the "most important factors" in determining which medical sources she found persuasive based on those source's "supportability" and "consistency." See *id.* Under the new regime, the ALJ sufficiently explained why she found impartial medical expert Dr. McKenna persuasive, reasoning that his opinion was both supportable and consistent with the record as a whole. [AR at 29.] Elaborating on both factors, she explained that despite Plaintiff's complaints of hip pain and need for a hip replacement, her left hip and pelvis x-ray from June 2017 was within normal limits. [*Id.*] She also pointed out that Plaintiff's orthopedist concluded her pains "do not reliably refer to the hip joint," and he recommended concentrating on her spine over her hip. [*Id.*] Dr. McKenna construed the degenerative disc disease and facet arthritis in her lumbar spine MRI as age-appropriate and noted her EMG revealed only subtle evidence of lumbar neuropathy and did not show abnormalities of the right upper extremity. [*Id.*]

That said, the ALJ's assessment of Dr. Baxley's opinion also appears to turn, at least in part, on Plaintiff's subjective allegations of pain. As Plaintiff points out, the ALJ "did not identify what evidence * * * led her to believe Dr. Baxley relied too heavily upon subjective symptoms." [23 (Pl. Br.) at 11.] Addressing consistency, the ALJ explained that Dr. Baxley's observations that claimant was in significant pain were undermined by Dr. Baxley's own reliance on Plaintiff's symptoms as well as her notes that Plaintiff did not appear to be in acute distress. Without an explanation as to why Plaintiff's subjective allegations are incredible, it is difficult to assess why those subjective symptoms were an unreliable source for Dr. Baxley. Furthermore, the ALJ has

not explained how the fact that Plaintiff did not appear to be in "acute distress" is inconsistent with Plaintiff's allegations that her pain fluctuated between "good" and "bad" days, and the real possibility that Plaintiff's visits occurred on the "good" days.

## VI. Conclusion

In sum, having concluded that the ALJ has not built a logical bridge between Plaintiff's account of her severe pain and the ALJ's credibility determination, remand is necessary. To be sure, the ALJ provided a thorough review of the medical evidence in the record, but given that her residual capacity findings and weighing of the opinions of Dr. Baxley are inextricably intertwined with the ALJ's view of Plaintiff's subjective symptoms, remand is necessary to fully develop the record. The Court reiterates that this Court does not—and cannot—instruct the ALJ to reach any specific conclusion. Nevertheless, the ALJ must provide adequate explanation of whatever findings and conclusions she reaches to allow for meaningful appellate review, and thus remand is necessary for further proceedings consistent with this opinion.

Dated: September 12, 2022

Robert M. Dow, Jr.
United States District Judge